United States Bankruptcy Court
Southern District of Texas

**ENTERED**

May 07, 2026

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 24-31882** |
| **JEFFERY PAUL CROWDER,** | § | |
| | § | **CHAPTER 7** |
| Debtor. | § | |
| | § | |
| **KELLY GROVES,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 24-3147** |
| | § | |
| **JEFFERY PAUL CROWDER,** | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION</u>

Kelly Groves seeks entry of judgment in the amount of $758,345.59 against Jeffery Paul Crowder and a determination that the resulting judgment debt is excepted from discharge under the Bankruptcy Code provisions governing debts arising from false pretenses or fraud, fraud or defalcation in a fiduciary capacity (including embezzlement or larceny), and willful and malicious injury. She also seeks denial of Mr. Crowder's discharge based on an alleged false oath or account. The Court conducted a trial on January 28, 2026.

To prevail on a dischargeability complaint, a creditor must first prove the existence of an enforceable underlying debt owed by the debtor to the creditor. If the creditor fails to establish an underlying debt, the nondischargeability claims necessarily fail because there is no debt to except from discharge. That is what occurred here. For the reasons set forth below, the Court finds that, based on a preponderance of the evidence, Ms. Groves did not carry her burden to prove that Mr.

Crowder owes her any underlying debt. Accordingly, Ms. Groves's claims for nondischargeability are denied. Ms. Groves's request for denial of Mr. Crowder's discharge is also denied.

## I.   FINDINGS OF FACT

This Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure ("*Rule*") 52, which is made applicable to adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure ("*Bankruptcy Rule*") 7052.  To the extent that any finding of fact constitutes a conclusion of law, it is adopted as such. To the extent that any conclusion of law constitutes a finding of fact, it is adopted as such. This Court made certain oral findings and conclusions on the record. This Memorandum Opinion supplements those findings and conclusions. If there is an inconsistency, this Memorandum Opinion controls.

### A.  Background

1. On April 26, 2024 (the "*Petition Date*") Jeffery Paul Crowder ("*Debtor/Defendant*") filed for bankruptcy protection under chapter 7 of the Bankruptcy Code[1] initiating this bankruptcy case.[2]

2. On July 30, 2024, Kelly Groves, ("*Plaintiff*") filed the instant adversary complaint (the "*Complaint*").[3]

3. On November 12, 2024, Defendant filed his answer to the Complaint ("*Answer*").[4]

4. On April 30, 2025, Plaintiff filed "Plaintiff's Motion for Summary Judgment"[5] ("*Motion for Summary Judgment*").

---

[1] Any reference to "Code" or "Bankruptcy Code" is a reference to the United States Bankruptcy Code, 11 U.S.C., or any section (i.e.§) thereof refers to the corresponding section in 11 U.S.C.

[2] "Bankr. ECF" refers docket entries made in the Debtor's bankruptcy case, No. 24-31882.  Entries made in Adversary Case number 24-3147 shall take the format of ECF No. __.  Bankr. ECF No. 1.

[3] ECF No. 5.

[4] ECF No. 8.

[5] ECF No. 20.

5.  On June 13, 2025 the Court entered its order denying the Motion for Summary Judgment.[6]

6.  On January 28, 2026, the Court held a trial.

## II.   CONCLUSIONS OF LAW

### A. Jurisdiction and Venue

This Court holds jurisdiction pursuant to 28 U.S.C. § 1334 and exercises its jurisdiction in accordance with Southern District of Texas General Order 2012–6.[7] Section 157 allows a district court to "refer" all bankruptcy and related cases to the bankruptcy court, wherein the latter court will appropriately preside over the matter.[8] This court determines that pursuant to 28 U.S.C. § 157(b)(2)(I) and (J) this proceeding contains core matters, as it primarily involves dischargeability of particular debts and an objection to discharge.[9] This proceeding is also core under the general "catch-all" language because such a suit is the type of proceeding that can only arise in the context of a bankruptcy case.[10] This Court may only hear a case in which venue is proper.[11] 28 U.S.C. § 1409(a) provides that "a proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending." Debtor's main bankruptcy case is pending in this Court and therefore, venue is proper.

### B. Constitutional Authority to Enter a Final Order

---

[6] ECF No. 23.

[7] *In re*: *Order of Reference to Bankruptcy Judges*, Gen. Order 2012–6 (S.D. Tex. May 24, 2012).

[8] 28 U.S.C. § 157(a); *see also* In re: Order of Reference to Bankruptcy Judges, Gen. Order 2012-6 (S.D. Tex. May 24, 2012).

[9] *See* 11 U.S.C. § 157(b)(2)(I) & (J).

[10] *See Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.*), 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.") (quoting *Wood v. Wood (In re Wood), 825 F.2d 90, 97 (5th Cir. 1987)).

[11] 28 U.S.C. § 1408.

While bankruptcy judges can issue final orders and judgments for core proceedings, absent consent, they can only issue reports and recommendations on non-core matters.[12] The determination of dischargeability of a particular debt and general discharge are a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (J). Accordingly, this Court concludes that the narrow limitation imposed by *Stern v. Marshall*[13] does not prohibit this Court from entering a final order here.[14] Alternatively, this Court has constitutional authority to enter a final order because all parties in interest have explicitly consented to adjudication of this dispute by this Court.[15] Thus, this Court wields the constitutional authority to enter a final order here.

### III.    Credibility of Witnesses

It is the Court's duty to assess and weigh the credibility of witnesses.[16] At the January 28, 2026 trial, the Court heard testimony from the following witnesses: Plaintiff; Defendant and Kent

---

[12] *See* 28 U.S.C. §§ 157(b)(1), (c)(1); *see also Stern v. Marshall*, 564 U.S. 462, 480 (2011); *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1938–40 (2015).

[13] 564 U.S. 462, 480 (2011).

[14] *See, e.g.*, *Badami v. Sears (In re AFY, Inc.),* 461 B.R. 541, 547-48 (8th Cir. BAP 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."); see also *Tanguy v. West (In re Davis),* No. 00-50129, 538 F. App'x 440, 443 (5th Cir. 2013) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect' .... We decline to extend *Stern's* limited holding herein.") (Citing *Stern*, 564 U.S. at 475, 503, 131 S.Ct. 2594).

[15] *Wellness Int'l Network, Ltd. v. Sharif,* 575 U.S.655, 135 S. Ct. 1932, 1947, 191 L.Ed.2d 911 (2015) ("*Sharif* con-tends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed. We disagree. Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent . . . ."); ECF No. 30 at 2.

[16] *O'Connor v. Burg* (*In re Burg*), 641 B.R. 120 (Bankr. S.D. Tex. 2022); *In re Bigler LP*, 458 B.R. 345, 367 (Bankr. S.D. Tex. 2011) (citing *Port Arthur Towing Co. v. John W. Towing, Inc*, 42 F.3d 312, 318 (5th Cir. 1995)).

Anderson ("*Mr. Anderson*").[17] Plaintiff is a citizen of Texas and currently resides in Montgomery County, Texas.[18] Defendant is the debtor in this case and currently resides in San Jacinto County, Texas. [19] Mr. Anderson is the brother of Plaintiff and Plaintiff resided with Mr. Anderson from around September 2021 to August 2023.[20] Each witness—Plaintiff, Defendant, and Mr. Anderson—answered questions clearly, competently, and directly. [21] Accordingly, the Court finds Plaintiff, Defendant, and Mr. Anderson to be credible witnesses and affords substantial weight to each of their testimony.

## IV.    ANALYSIS

Plaintiff seeks entry of judgment against Defendant in the amount of $758,345.59 and a determination that the resulting debt is nondischargeable based on fraud, defalcation while acting in a fiduciary capacity (or embezzlement or larceny), and willful and malicious injury.[22] Plaintiff further seeks denial of Defendant's discharge based on an alleged false oath or account in connection with the bankruptcy case.[23] These requests are made under controlling Fifth Circuit authority and applicable bankruptcy law.

The burden of proof lies with Plaintiff[24] and the standard of proof is preponderance of the evidence.[25] Additionally, non-dischargeability must be established by a preponderance of the

---

[17] Jan. 28, 2026 Min. Entry.

[18] ECF No. 25 at 2.

[19] ECF No. 8 at 1.

[20] Jan. 28, 2026 Trial (Mr. Anderson testifying).

[21] *See, e.g., In re Ali*, 2015 Bankr. LEXIS 2443, 2015 WL 4611343 at *4 (Bankr. W.D. Tex. July 23, 2015) (analyzing the clarity, completeness, and quality of witness responses in order to make credibility determinations).

[22] 11 U.S.C. §§ 523(a)(2)(A); (a)(4); and (a)(6).

[23] ECF No. 5 at 6–14.

[24] United States v. Coney, 689 F.3d 365 (5th Cir. 2012)

[25] Cowin v. Countrywide Home Loans, Inc. (In re Cowin), 864 F.3d 344 (5th Cir. 2017)

evidence. Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start. However, the Bankruptcy Code limits the opportunity for a new beginning to the honest, but unfortunate, debtor.[26]

## A. The Complaint

The Complaint references a default judgment issued in Cause No. 23-05-06553 in the 457th Judicial District Court of Montgomery County, Texas on May 8, 2023 (the "*Default Judgment*").[27] Plaintiff requests that the debt arising from the Default Judgment be deemed non-dischargeable under §§ 523(a)(2)(A); (a)(4); and (a)(6), and further requests a general denial of discharge under §727(a)(4).[28] Plaintiff's § 523(a) claims to deem the Default Judgment debt non-dischargeable, as well as her § 727(a)(4) claim for a general denial of discharge, rest primarily on the allegation that Defendant, acting through his wholly owned entity, CCMC, LLC ("*CCMC*"), made false representations or committed fraud in connection with a construction contract entered into between Plaintiff and CCMC.[29] In her Complaint, Plaintiff seeks to recover $206,787.69 in actual damages, $542,985.00 in exemplary damages, and $8,572.90 in attorneys' fees and costs, for a total requested judgment of $758,345.59 against Debtor.[30] But in post-trial briefing, Plaintiff asserts that the amount of damages arising from Debtor's allegedly wrongful actions is equal to $180,995.30.[31]

---

[26] Cowin v. Countrywide Home Loans, Inc. (In re Cowin), 864 F.3d 344 (5th Cir. 2017)

[27] ECF No. 5 at 2.

[28] ECF No. 5.

[29] *See* ECF No. 5 at 6–14.

[30] *See* ECF No. 5 at 4.

[31] ECF No. 44 at 15.

**B.  The parties' request for judgment based on partial findings**

Under Rule 52(c), made applicable to this proceeding through Bankruptcy Rule 7052, if a party rests their case-in-chief or has been fully heard on an issue in a non-jury trial, and "the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue."[32] "In addressing  a Rule 52(c) motion, the court does not view the evidence in the light most favorable to the nonmoving party, as it would in passing on a Rule 56 motion for summary judgment or a Rule 50(a) motion for judgment as a matter of law; instead, it exercises its role as factfinder."[33] Judgment entered under Rule 52(c) is made after the trial court has heard all of the "evidence bearing on crucial issues of fact."[34]

At the January 28, 2026 trial held for this instant adversary proceeding, both Defendant and Plaintiff moved for a judgment based on partial findings under Bankruptcy Rule 7052 on several grounds.[35] Defendant moved for a judgment based on partial findings, arguing that no underlying liability exists because there is no contract between Plaintiff and Defendant and Plaintiff has waived any veil-piercing theory.[36] Plaintiff moved for a judgment based on partial findings as to three affirmative defenses raised by Defendant in his Answer.[37] Defendant withdrew

---

[32] Fed. R. Civ. P. 52(c).

[33] *United States v. $242,484.00 in United States Currency*, 389 F.3d 1149, 1172 (11th Cir. 2004); *Nancy Jones v. Estate of Cole*, 483 F. App'x 468, 472 n.4 (10th Cir. 2012) (citing Fed. R. Civ. P. 52(c) advisory committee's note); *Samson v. Apollo Res., Inc.*, 242 F.3d 629, 632 (5th Cir. 2001).

[34] *Samson*, 242 F.3d at 632.

[35] Jan. 28, 2026 Min. Entry.

[36] Jan. 28, 2026 Trial (statements by Defendant's counsel).

[37] Jan. 28, 2026 Trial (statements by Plaintiff's counsel).

two of his affirmative defenses after Plaintiff moved for judgment based on partial findings.[38] The only remaining affirmative defense by Defendant is his affirmative defense of force majeure based on the onset of the COVID-19 pandemic.[39] The Court will consider the remaining affirmative defense of force majeure only if Plaintiff first meets her burden on her affirmative claims against Defendant.[40] Finally, Plaintiff also moved for a judgment based on partial findings on her non-dischargeability claims under §§ 523(a)(2)(A); (a)(4); and (a)(6) and her claim for a  general denial of discharge under § 727(a)(4).[41] Accordingly, the Court will now address each of Plaintiff's claims.

## C.  Establishment of the underlying debt

There are two distinct issues to consider in the dischargeability analysis: (a) the establishment of the debt itself, under relevant state or non-bankruptcy federal law; and (b) a

---

[38] Jan. 28, 2026 Trial (statements by Defendant's counsel).

[39] ECF No. 8 at 4.

[40] *See In re Willow Bend Ventures, L.L.C.*, 589 B.R. 276, 282-83 (Bankr. E.D. La. 2018*)* ("[T]he burden is on a plaintiff in a civil action to establish a prima facie case. The opposing party need not supply any countervailing evidence until this is done. If the plaintiff fails, his cause of action will be defeated. If a plaintiff succeeds in establishing a prima facie case, the burden will shift to the defendant to overcome the initial allegations then back to the plaintiff to prove his case by preponderance of evidence. Once plaintiff proves his case by a preponderance of  evidence, the burden returns to the defendant to eliminate an element of the claim or prove a defense by evidence sufficient to overcome plaintiff's proof.").

[41] Jan. 28, 2026 Trial (statements by Defendant's counsel).

determination as to the nature of the debt—i.e. whether it is dischargeable or nondischargeable.[42]

The Plaintiff has the initial burden of establishing the underlying debt in an action under § 523(a).[43]

The Default Judgment referenced in the Complaint was not admitted into evidence at the trial.[44] But, the Complaint alleged that the Default Judgment held Defendant liable to Plaintiff for breach of contract and fraud in connection with contracts entered into between Plaintiff and CCMC.[45]

Accordingly, the Court will determine whether Plaintiff has carried her burden to prove that Defendant is liable for breach of contract or fraud under governing Fifth Circuit standards, and, if liability is established, the amount of any resulting judgment debt.

### 1. Breach of Contract

Texas law applies because all the parties reside in Texas and the alleged formation and breach of contract occurred in Texas.[46] To prevail on her breach of contract claim, Plaintiff must

---

[42] *Resolution Trust Corp. v. McKendry (In re McKendry)*, 40 F.3d 331 (10th Cir. 1994) (noting that there are two distinct issues in a nondischargeability proceeding); *Winn v. Holdaway (In re Holdaway)*, 388 B.R. 767, 782 (Bankr. S.D. Tex. 2008) ("The underlying cause creating the pre-petition debt must not be confused with the characterization of debts excepted from discharge."); *Estate of Smith v. Smith (In re Smith)*, 495 B.R. 291, 297 (Bankr. N.D. Miss. 2013) (holding that a claim must first be established under relevant state or non-bankruptcy law and only then does the federal nondischargeability issue come into play); *King v. Skolness (In re King)*, 624 B.R. 259, 287 (Bankr. N.D. Ga. 2020) ("The first step is to determine whether a debt exists. If the debtor owes a debt to the plaiintiff, the second step is to determine the nature of the debt—i.e. whether it is dischargeable or nondischargeable.").

[43] *In re Holdaway*, 388 B.R. at 779.

[44] Jan. 28, 2026 Min. Entry.

[45] ECF No. 5 at 2–5.

[46] See *ASARCO LLC v. Americas Min. Corp.*, 382 B.R. 49, 62 (S.D. Tex. 2007) ("In applying the Restatement's 'most significant relationship test', this Court considers the following factors: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship between the parties is centered."); *Enigma Holdings, Inc. v. Gemplus Int'l S.A.*, No. 3:05 CV 1168 B, 2006 U.S. Dist. LEXIS 72996, 2006

prove, by a preponderance of the evidence: "(a) the existence of a valid contract; (b) performance or tendered performance by the plaintiff; (c) breach by the defendants; and (d) damages sustained as a result of that breach."[47]

### a. The existence of a contract between Plaintiff and Defendant

On September 29, 2021, Plaintiff and CCMC entered into a contract entitled "Unimproved Property Contract" (the "*Land Contract*") where CCMC agreed to sell Plaintiff unimproved land located at 47 Bermuda Montgomery County, Texas 77356 (the "*Unimproved Lot*") for a purchase price of $20,000.[48] Also on September 29, 2021, Plaintiff and CCMC entered into a contract entitled "New Home Contract" (the "*Construction Contact*," and together with the Land Contract, the "*Contracts*") where CCMC agreed to construct a residential property (the "*Property*") on the Unimproved Lot for $328,504.[49] Although Defendant is the sole owner of CCMC, the Contracts were signed by Plaintiff and CCMC and not in Defendant's individual capacity.[50] No evidence was presented to demonstrate that a valid contract exists between Plaintiff and Defendant in his individual capacity. Therefore, the Court finds that Plaintiff failed to meet her burden to establish the existence of a valid contract between Plaintiff and Defendant. The remainder of the elements need not be discussed. However, at trial, the Court sua sponte questioned whether a piercing of the corporate veil argument was raised which the Court will next explore.

### b. Piercing the corporate veil

---

WL 2859369, at *7 (N.D. Tex. Oct. 6, 2006) ("Texas courts decide choice of law issues by using the Restatement's 'most significant relationship' test."); ECF No. 5; Bankr. ECF No 1.

[47] *Cnty. Real Est. Venture v. Farmers & Merchants Bank of Long Beach*, No. 01-13-00530-CV, 2015 Tex. App. LEXIS 1409, 2015 WL 591646, at *2 (Tex. App. Feb. 12, 2015).

[48] ECF No. 25-2 at 5.

[49] ECF No. 25-2 at 5.

[50] Bankr. ECF No. 13 at 7; ECF No. 25-2 at 12, 22.

Texas Business Organization Code ("*Tex. Bus. Orgs. Code*") § 21.223(a)(2) creates a liability shield for corporations by providing that:

> A holder of shares, an owner of any beneficial interest in shares, or a subscriber for shares whose subscription has been accepted, or any affiliate of such a holder, owner, or subscriber or of the corporation, may not be held liable to the corporation or its obligees with respect to . . . any contractual obligation of the corporation or any matter relating to or arising from the obligation on the basis that the holder, beneficial owner, subscriber, or affiliate is or was the alter ego of the corporation or on the basis of actual or constructive fraud, a sham to perpetrate a fraud, or other similar theory[51]

But, in cases of fraud, § 21.223(b) creates an exception to the statutory protection established under § 21.223(a)(2), providing that:

> [Tex. Bus. Orgs. Code 21.223(a)(2)] does not prevent or limit the liability of a holder, beneficial owner, subscriber, or affiliate if the obligee demonstrates that the holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate.

Tex. Bus. Orgs. Code § 101.002(a) expressly makes § 21.223 applicable to limited liability companies ("*LLCs*") and its owners and § 101.002(b) provides that references to corporate terms such as "shares" and "shareholders," as used in § 21.223, include terms specific to LLCs, such as "membership interests" and "members."[52] Tex. Bus. Orgs. Code further reinforces the liability shield of an LLC by providing that "[e]xcept as and to the extent the company agreement specifically provides otherwise, a member or manager is not liable for a debt, obligation, or liability of a limited liability company, including a debt, obligation, or liability under a judgment, decree, or order of a court."[53]

---

[51] Tex. Bus. Orgs. Code 21.223(a)(2).

[52] Tex. Bus. Orgs. Code 101.002(a),(b); *Keyes v. Weller*, 692 S.W.3d 274, 279 (Tex. 2024) ("Though the provisions [of Tex. Bus. Orgs. Code] themselves reference only corporations, they apply to limited liability companies as well.")

[53] Tex. Bus. Orgs. Code § 101.114. See also Tex. Bus. Orgs. Code §§ 101.002, 21.223.

Thus, members or managers of an LLC are generally not individually liable for the LLC's debts or other liabilities absent a separate agreement in the member's individual capacity.[54] But, there are exceptions to an LLC's statutory protections. "The statutory protections afforded to members and managers of an LLC give way only when a plaintiff can show that the LLC was used for the purpose of perpetrating, and did perpetrate, an actual fraud for the member or manger's direct personal benefit."[55] "To pierce the veil, it is not enough to show that the LLC was an alter-ego or a 'sham' company. . . . To recover against a member of an LLC individually, the plaintiff must show dishonesty of purpose or intent to deceive."[56]

Texas case law provides that a plaintiff waives the right to impose liability on an individual member of an LLC under a veil-piercing or alter ego theory if those theories are not properly pleaded, unless they are tried by implied or express consent.[57] Here, Plaintiff has not pled any theories of alter ego or veil piercing in her Complaint.[58] There is also no evidence that Defendant consented, either implicitly or explicitly, to trying such theories. In fact, at trial, Defendant's

---

[54] *Julka v. United States Bank Nat'l Ass'n*, 516 S.W.3d 84, 88 (Tex. App. 2017) ("A bedrock principle of corporate law is that an individual can incorporate a business and thereby normally shield himself from personal liability for the corporation's contractual obligations.").

[55] *Metroplex Mailing Servs. v. RR Donnelley & Sons Co.*, 410 S.W.3d 889, 896 (Tex. App. 2013).

[56] *Fin & Feather Club v. Leander*, 415 S.W.3d 548, 556 (Tex. App. 2013).

[57] *Endsley Elec., Inc. v. Altech, Inc.*, 378 S.W.3d 15, 22 (Tex. App. 2012) ("The various theories for piercing the corporate veil must be specifically pled or they are waived, unless they are tried by consent."); *Mapco, Inc. v. Carter*, 817 S.W.2d 686, 688 (Tex. 1991) ("There is also no support for the entry of judgment . . . based on an alter ego, piercing the corporate veil or agency theory. A trial court judgment must conform to the pleadings of the parties. The [parties] did not plead alter ego, piercing the corporate veil or agency. Furthermore, the argument that the issues were tried by implied consent fails because there is no evidence to indicate they were actually tried. For these reasons, the court of appeals erred in affirming the judgment."); *Seidler v. Morgan*, 277 S.W.3d 549, 557 (Tex. App. 2009); *In re Lee*, 686 S.W.3d 449, 461 (Tex. App. 2024).

[58] ECF No. 5.

counsel objected to trying any veil piercing or alter ego theories on the basis that such theories were not pled by Plaintiff.[59] Therefore, the Court finds that Plaintiff has waived any veil piercing or alter ego theories as a basis for imposing liability on Defendant. Additionally, since the existence of a valid contract is required to prevail on a breach of contract claim and as explained *supra*, Plaintiff has not demonstrated an existence of a valid contract between Plaintiff and Defendant,[60] Plaintiff cannot impose liability on Defendant based upon a breach of contract claim against CCMC because Plaintiff waived her ability to pierce CCMC's corporate veil. Therefore, the Court finds that the breach of contract claim by Plaintiff against Defendant fails as a matter of law.

Accordingly, because Plaintiff failed to carry her burden to prove the existence of a valid contract between Plaintiff and Defendant[61], and because Plaintiff waived any veil-piercing or alter-ego theory as a basis to impose liability on Defendant, Plaintiff cannot establish the requisite underlying liability on a breach-of-contract theory where the operative contracts were between Plaintiff and CCMC—not between Plaintiff and Defendant. Therefore, Defendant's motion for judgment on partial findings under Rule 52(c), as incorporated through Bankruptcy Rule 7052, is granted as to Plaintiff's breach-of-contract claim.

### 2. Fraud

"Under well-settled Texas common law, individuals are personally liable for torts they commit as corporate agents."[62] In *Keyes v. Weller*,[63] the Texas Supreme Court recently analyzed

---

[59] Jan. 28, 2026 Trial (statements by Defendant's counsel).

[60] *See supra* Section IV.C.1.a.

[61] Jan. 28, 2026 Trial (statements by Defendant's counsel).

[62] *Keyes v. Weller*, 692 S.W.3d 274, 279 (Tex. 2024).

[63] 692 S.W.3d 274.

the effect of Tex. Bus. Org. Code § 21.223's liability shield on this common-law principle and held that "Section 21.223 does not apply to, and thus does not limit liability for, claims against corporate shareholders and officers premised on their alleged tortious conduct as agents of the company."[64] Moreover, under Texas law, a corporate officer who knowingly participates in tortious or fraudulent conduct may be personally liable to third parties, even when acting as an agent of the corporation and even when the corporate veil is not pierced.[65]

"Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations" and "the legal duty not to fraudulently procure a contract is separate and independent from the duties established by the contract itself."[66] Additionally, "tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract."[67] Thus, under Texas law, an agent of an LLC may be held personally liable for fraudulent representations made to a

---

[64] *Id.* at 281.

[65] *Commercial Escrow Co. v. Rockport Rebel, Inc.*, 778 S.W.2d 532, 541 (Tex. App. 1989) ("A corporate officer who knowingly participates in tortious or fraudulent acts may be held individually liable to third persons even though he performed the act as an agent of the corporation. It is not necessary that the 'corporate veil' be pierced in order to impose personal liability, as long as it is shown that the corporate officer knowingly participated in the wrongdoing."); *Nwokedi v. Unlimited Restoration Specialists, Inc.*, 428 S.W.3d 191, 201 n.1 (Tex. App. 2014) (holding that because there was sufficient evidence to hold a defendant individually liable for fraud, it was not necessary to consider whether the defendant was the alter ego of a corporate entity); *Antonio munoz Aserradero, LLC v. Thomas*, No. 12-25-00047-CV, 2026 Tex. App. LEXIS 2261, at *33 (Tex. App. Mar. 11, 2026) ("LLC members likewise are individually liable for their own tortious conduct in participating and directing wrongdoing, separate and apart from any veil-piercing or similar doctrines."); *Walker v. Federal Deposit Ins. Corp.*, 970 F.2d 114, 122 (5th Cir. 1992) (applying Texas law) ("If a corporate officer knowingly participates in a tortious act, there is no need to pierce the corporate veil in order to impose personal liability.")

[66] *Formosa Plastics Corp. United States v. Presidio Eng'rs & Contractors*, 960 S.W.2d 41, 46 (Tex. 1998).

[67] *Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, 184 S.W.3d 840, 868 (Tex. App. 2006).

plaintiff, without piercing the corporate veil, even if those representations were made on behalf of the LLC and in connection with a contract between the LLC and the plaintiff.[68]

Here, Plaintiff alleges Defendant committed fraud by misrepresenting that he—acting on behalf of CCMC—would convey the unimproved lot and construct the property, despite having no present intent to perform, and that Plaintiff suffered damages by reasonably relying on those misrepresentations.[69] Even if Plaintiff has waived any right to pierce CCMC's corporate veil, that waiver does not bar Plaintiff from asserting a direct fraud claim against Defendant based on his own misrepresentations and dealings with Plaintiff. Under Fifth Circuit principles, an individual corporate agent may be held personally liable for his own tortious conduct, including fraud, even when acting within the scope of his corporate role.[70]

Accordingly, because Plaintiff may pursue a fraud claim directly against Defendant without first piercing CCMC's corporate veil, Plaintiff is not barred from prevailing on her fraud claim merely because it waived veil-piercing or alter-ego theories as a basis for imposing liability on Defendant. Therefore, Defendant's motion for judgment on partial findings under Rule 52(c),

---

[68] *See Cimarron Hydrocarbons Corp. v. Carpenter*, 143 S.W.3d 560, 565 (Tex. App. 2004) (holding that claim of fraud under the Deceptive Trade Practices Act asserted against corporate agent in his individual capacity, based on his own alleged wrongful conduct, was not dependent on veil piercing because plaintiff did not contract directly with agent, notwithstanding that plaintiff contracted with the corporate entit ); *See Hernandez v. Nambo*, No. 09-23-00306-CV, 2025 Tex. App. LEXIS 3680, at *9 (Tex. App. May 29, 2025) (affirming, on appeal, a judgment that did not depend on a breach-of-contract or veil-piercing theory, and that was based on misrepresentations made by the debtor in connection with a contract between the plaintiff and the LLC) (citing *Keyes*, 692 S.W.3d at 275).

[69] ECF No. 5.

[70] *See also Hiner v. Koukhtiev* (*In re Koukhtiev*), 576 B.R. 107, 131 (Bankr. S.D. Tex. 2017) (holding that the plaintiff was entitled to a denial of dischargeability under § 523(a)(2)(A) on a showing of defendant's actual fraud, without any need to plead or allege personal liability "based on this veil piercing statute or, for that matter, on other any [sic] Texas statute"); *Hernandez v. Nambo*, No. 09-23-00306-CV, 2025 Tex. App. LEXIS 3680, at *9 (Tex. App. May 29, 2025).

as incorporated by Bankruptcy Rule 7052, is denied as to Plaintiff's state-law fraud claim against Defendant.

The Court will next consider whether Plaintiff met her burden for her fraud claim against Defendant.

### a. Standard for Fraud

In Texas, the elements of common-law fraud are:

> (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury.[71]

Plaintiff has the burden to prove each element by a preponderance of the evidence.[72] The Court will consider each element in turn.

### b. Material representations made by Defendant

"An actionable representation is one concerning a material fact; a pure expression of opinion  will not support an action for fraud."[73] "Whether a statement is an actionable statement of 'fact' or merely one of 'opinion' often depends on the circumstances in which a statement is made."[74] Relevant circumstances may include, *inter alia*, "the statement's specificity, the

---

[71] *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009); *Herrin v. Med. Protective Co.*, 89 S.W.3d 301, 305 (Tex. App. 2002).

[72] *Griggs v. Webber* (*In re Webber*), 350 B.R. 344, 371 (Bankr. S.D. Tex. 2006) ("Each element of fraud must be proven by a preponderance of evidence.") (applying Texas law); *Allstate Ins. Co v. Receivable Fin. Co. LLC*, 501 F.3d 398, 406 (5th Cir. 2007) (applying Texas law).

[73] *Holland v. Thompson*, 338 S.W.3d 586, 596 (Tex. App. 2010).

[74] *Id.*

speaker's knowledge, the comparative levels of the speaker's and the listener's knowledge, and whether the statement relates to the present or the future."[75]

Here, Plaintiff alleges that Defendant made false and material representations in two ways. First, at the time the parties entered into the Land Contract and Construction Contract, Defendant allegedly promised—without any present intent to perform—that Defendant, on behalf of CCMC, would substantially complete construction of the Property on the Unimproved Lot by April 22, 2022, for a total contract price of $348,504.00, inclusive of the $20,000 purchase price for the Unimproved Lot and the $328,504 construction price. Second, Plaintiff alleges that after the parties entered into the Contracts—and after the April 22, 2022 deadline—Defendant requested additional funds from Plaintiff, resulting in Plaintiff paying CCMC more than $348,504.00, by representing that the additional money was necessary to pay for materials and labor being provided to Plaintiff, but Defendant did not actually use those funds to complete construction of the Property.[76] Plaintiff further alleges that the resulting overpayment totaled $70,189.69.[77]

Here, the contracts between CCMC and Plaintiff provide that CCMC would sell Plaintiff the unimproved lot and construct the residence on that lot for a total price of $348,504, comprised of $20,000 for the unimproved lot and $328,504 for construction.[78] In the Fifth Circuit, the contract price in a construction agreement is generally treated as a material term because it goes to the essence of the parties' bargain.[79] Plaintiff's testimony confirms that, when she entered into

---

[75] *Id.*

[76] ECF No. 5 at 2–8.

[77] ECF No. 5 at 3; 44 at 14.

[78] ECF No. 25-2 at 5, 15.

[79] *See Tex. Star Nut & Food Co. v. Barrington Packaging Sys. Grp., Inc.*, No. 5-21-CV-00444-JKP-RBF, 2021 U.S. Dist. LEXIS 202900, at *7 (W.D. Tex. Oct. 21, 2021); *French v. Wilkinson (In re Wilkinson)*, Nos. 21-41141-ELM, 21-

the contracts, Defendant did not disclose that the total construction price would increase beyond the stated $348,504.[80] On this record, the Court finds that Defendant's representation—made on behalf of CCMC—that CCMC would complete construction for a total price of $348,504 was a material representation.

Section 7(E) of the Construction Contract required CCMC to commence construction no later than 65 days after the parties executed the agreement on September 29, 2021—i.e., by December 3, 2021—and further required that construction be substantially complete and the Property ready for occupancy no later than April 22, 2022.[81] Defendant proposed these deadlines and inserted them into the Construction Contract.[82] Plaintiff alleges that the December 3, 2021 start date and April 22, 2022 substantial-completion/occupancy date were material representations on which she relied.[83] However, under Fifth Circuit principles applying general contract law, time of performance is not ordinarily treated as a material term absent clear indicia that the parties intended strict compliance with the stated terms.[84]  The mere inclusion of performance dates in a contract, without more, generally does not establish that "time is of the essence." Accordingly, for the Construction Contract's deadlines to constitute material representations (as opposed to non-essential scheduling targets), the contract must either expressly make time of the essence as to

---

04049, 2025 Bankr. LEXIS 2668, at *75 (Bankr. N.D. Tex. Oct. 15, 2025) ("For construction contracts, the essential terms are the home's design, location, material, size, and cost (or a formula to calculate the final cost.").

[80] Jan. 28, 2026 Trial (Plaintiff testifying).

[81] ECF No. 25-2 at 18.

[82] Jan. 28, 2026 Trial (Plaintiff testifying).

[83] Jan. 28, 2026 Trial (Plaintiff testifying).

[84] *In re Caballero*, 441 S.W.3d 562, 574 (Tex. App. 2014).

those deadlines, or the surrounding circumstances must show that the contract's subject matter, purpose, and context made timely performance a central, bargained-for requirement.[85]

The Construction Contract does not contain a "time is of the essence" provision specific to the construction deadlines set forth in section 7(E).[86] In fact, section 7(E) of the Construction Contract provides for exceptions, such as acts of God or the nonavailability of materials, that may extend the construction deadlines.[87] Plaintiff's testimony shows that timely construction was, in fact, very important to her because Plaintiff was living with her brother, Mr. Anderson, while waiting for construction of the Property to be completed.[88] Plaintiff testified that she did not expect to live with Mr. Anderson for longer than the April 22, 2022 deadline set out in the Construction Contract when she moved in with Mr. Anderson.[89] Mr. Anderson's testimony shows that, before the Construction Contract was entered into, Defendant met with both Mr. Anderson and Plaintiff to discuss Defendant's prior construction experience.[90] Despite Defendant's interactions with both Mr. Anderson and Plaintiff, there is no evidence to demonstrate that Defendant was aware of Plaintiff's living situation or that her living situation otherwise made time of the essence with respect to the completion deadline in the Construction Contract. Moreover, Plaintiff never attempted to terminate the Construction Contract upon expiration of the deadlines set forth in the Construction Contract, and although Plaintiff eventually fired Defendant, she did not do so at the time those deadlines expired.[91] Instead, Plaintiff admitted at trial that although Defendant, on

---

[85] *Id.*

[86] ECF No. 25-2 at 18.

[87] ECF No. 25-2 at 18.

[88] Jan. 28, 2026 Trial (Plaintiff testifying).

[89] Jan. 28, 2026 Trial (Plaintiff testifying).

[90] Jan. 28, 2026 Trial (Mr. Anderson testifying).

[91] Jan. 28, 2026 Trial (Plaintiff testifying).

behalf of CCMC, did not commence construction until after April 22, 2022, Plaintiff did not object to Defendant beginning construction in June 2022.[92]

As a result, the Court finds that the only relevant material representation Defendant made to Plaintiff was that construction of the Property could be completed for a total price of $348,504, inclusive of the purchase price of the Unimproved Lot and the cost of construction. But Plaintiff has not carried her burden to show that Defendant's alleged statements—namely, that he would begin construction within 65 days of executing the Construction Contract and would substantially complete construction by the April 22, 2022 deadline—constituted material misrepresentations under governing Fifth Circuit standards.

### c. Whether Defendant knowingly, or without knowledge of their truth, made material representations to Plaintiff that were false

"A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made."[93] "Proving that a party had no intention of performing at the time a contract was made is not easy, as intent to defraud is not usually susceptible to direct proof." [94] Breach of the contract alone is not evidence that a party did not intend to perform but a "breach combined with 'slight circumstantial evidence' of fraud" can be evidence of fraudulent intent sufficient to support a verdict.[95] Such circumstantial

---

[92] *See Jennings v. Jennings*, 625 S.W.3d 854, 866 (Tex. App. 2021) ("'[A] stipulated time limit may be extended either by agreement or by waiver.' If by waiver, '[s]uch a waiver . . . may be shown . . . from the circumstances or course of dealing.'"); Jan. 28, 2026 Trial (Plaintiff testifying).

[93] *Formosa Plastics Corp. United States v. Presidio Eng'rs & Contractors*, 960 S.W.2d 41, 48 (Tex. 1998); *Fluorine on Call Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 858 (5th Cir. 2004) ("To show fraud based on a promise of future performance, a plaintiff must also show that the person making the promise had no intention of performing at the time he made the promise.").

[94] *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 775 (Tex. 2009).

[95] *Id.*

evidence must be relevant to a defendant's intent at the time the representation was made.[96] Although a party's intent is evaluated at the time that party made the representation, "a party's intent may be inferred by the party's subsequent acts following the representation."[97] "Courts have held a party's denial that he ever made a promise is a factor showing no intent to perform when he made the promise."[98] To show fraud based on a promise of future performance, a plaintiff must show that the defendant made his promise knowing that he would not perform or without knowledge of his intent to perform.[99] The Court will now consider whether, when the Defendant entered into the Contracts on behalf of CCMC, Defendant either lacked the intention to, on behalf of CCMC, complete construction of the Property or knew that he could not complete the construction.

Testimony from Plaintiffs and text messages between Plaintiff and Defendant demonstrate that Defendant acted on behalf of CCMC in connection with the Contracts throughout all relevant periods, including before execution, during performance, and after termination of the Contracts.[100] Plaintiff terminated CCMC in or around March 2023 because she was unsatisfied with the progress CCMC was making on the Property construction.[101] Defendant admitted that he, on behalf of CCMC, had not completed construction of the Property when he was terminated, but testified that

---

[96] *Formosa Plastics*, 960 S.W.2d at 48.

[97] *Arete Partners LP v. Gunnerman*, 594 F.3d 390, 394 (5th Cir. 2010).

[98] *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986).

[99] *Walker v. Comdata Network, Inc.*, 730 S.W.2d 769, 772 (Tex. App. 1987) (rejecting argument that "a speaker making a declaration that he will perform an act in the future must intrinsically know whether he then possesses the affirmative intent to perform"); *Griggs v. Webber* (*In re Webber*), 350 B.R. 344, 371 (Bankr. S.D. Tex. 2006) (applying Texas law).

[100] Jan. 28, 2026 Trial (Plaintiff testifying).

[101] Jan. 28, 2026 Trial (Plaintiff testifying).

he always intended to finish.[102] Although construction was expected to begin by December 3, 2021 (65 days after CCMC and Plaintiff signed the Contracts on September 29, 2021), Defendant, on behalf of CCMC, did not actually begin the Property construction until June 2022.[103] Defendant and Plaintiff both testified that the initial delay was due to Defendant's inability to obtain approval of the site plan for the Property from the board of the property owners association ("*POA Board*") of the subdivision named "Bentwood" where the Unimproved Lot was located.[104] Plaintiff testified that Defendant presented a site plan (the "*First Site Plan*") to her around the time she entered into the Contract, that she approved the First Site Plan, and that it was submitted to the POA Board shortly after the Contracts were signed.[105] However, the First Site Plan was rejected by the POA Board, and a site plan had to be resubmitted to the POA Board eight separate times before approval was obtained.[106] The final site plan approved by the POA Board (the "*Final Site Plan*") was different from the First Site Plan that Defendant had presented to Plaintiff, but Plaintiff approved it nonetheless because she did not want the delays in construction to continue.[107] Notably, none of the site plans were admitted into evidence to demonstrate how the First Site Plan was different from the Final Site Plan.

Defendant explained that the site plans submitted to the POA Board were repeatedly rejected because the engineers and architects he relied on were measuring the required setback line from the street, while the POA Board was measuring the setback line from the curb.[108] Although

---

[102] Jan. 28, 2026 Trial (Defendant testifying).

[103] Jan. 28, 2026 Trial (Defendant and Plaintiff testifying).

[104] Jan. 28, 2026 Trial (Defendant and Plaintiff testifying).

[105] Jan. 28, 2026 Trial (Plaintiff testifying).

[106] Jan. 28, 2026 Trial (Defendant and Plaintiff testifying).

[107] Jan. 28, 2026 Trial (Defendant and Plaintiff testifying).

[108] Jan. 28, 2026 Trial (Defendant testifying).

it is unclear as to why eight revisions were needed to correct the issue related to the setback line, Defendant explained that submitting repeated proposals to the POA Board caused lengthy delays because the POA Board only met once a month and he had to wait up to 30 days to respond after each submission.[109] Defendant lived in the Bentwood subdivision and represented to Plaintiff that he had previously built homes there.[110]

However, the Court does not find that Defendant's prior experience with construction in the Bentwood subdivision, in itself, demonstrates that the delays in obtaining approval from the POA Board were intentional or that Defendant was otherwise aware, at the time CCMC entered into the Contracts with Plaintiff, that he would be unable to obtain timely approval of the First Site Plan. Additionally, the evidence demonstrates that once Defendant finally commenced construction of the Property in June 2022, there were additional delays caused by performance issues relative to third parties that Defendant hired on behalf of CCMC to complete portions of the construction.[111] Defendant testified that he was experiencing difficulties in getting third-party contractors and subcontractors to perform timely services.[112] For example, Defendant hired an independent contractor to perform construction services on the Property, including installation of a pony wall and services related to cabinet installation, but the independent contractor did not timely perform those services.[113] Text messages by Defendant to Plaintiff show Defendant

---

[109] Jan. 28, 2026 Trial (Defendant testifying).

[110] Jan. 28, 2026 Trial (Plaintiff testifying).

[111] Jan. 28, 2026 Trial (Defendant testifying).

[112] Jan. 28, 2026 Trial (Defendant testifying).

[113] ECF No. 25-13 at 115.

complaining that the independent contractor's delayed performance caused delays in flooring and plumbing installation.[114]

As such, the Court finds that delays in the construction of the Property—including delays attributable to Defendant's inability to obtain site-plan approval and delays arising from work performed by third-party contractors or subcontractors—were not intentionally or willfully caused by Defendant.

Next, Plaintiff asserts that Defendant ignored Plaintiff's requests for updates on the construction of the Property and misrepresented that he had been diagnosed with stage 4 pancreatic cancer and was undergoing chemotherapy as an excuse to avoid completion of the Property Construction or accounting for any of the money CCMC received from Plaintiff.[115] However, copies of text messages were admitted into evidence showing communications between Plaintiff and Defendant from October 19, 2021, through March 27, 2023.[116] These text messages show that although there were occasions where Defendant was slow to respond to Plaintiff's questions, he did in fact reply to most of her inquiries via text and remained in regular communication with Plaintiff regarding the construction.[117] For example, Plaintiff complained that she texted Defendant on March 17, 2023, asking, "[h]ow much longer before work starts happening at my house?" and that Defendant failed to respond to this text which caused Plaintiff to send a follow up text that same day.[118] However, on March 18, 2023, just one day later, Defendant responded that he had no

---

[114] ECF No. 25-13 at 97, 114, 115, 120.

[115] ECF No. 5 at 3; Jan. 28, 2026 Trial (Plaintiff testifying).

[116] ECF No. 25-13.

[117] ECF No. 25-13.

[118] Jan. 28, 2026 Trial (Plaintiff testifying); ECF No. 25-13 at 152.

other projects and that work was currently being completed on the Property.[119] Indeed, Plaintiff admitted, as is confirmed by the text messages, that between October 2021 and March 2023, Defendant responded to most of Plaintiff's texts.[120] The last text message Plaintiff sent to Defendant was on March 27, 2023, which was a complaint regarding the lack of progress Defendant had made on the construction.[121] But Defendant explained that the reason he did not respond to the final March 27, 2023 text message was because he was instructed by Mr. Anderson not to contact Plaintiff.[122]  Defendant also testified, and Plaintiff admitted, that Defendant also communicated with Plaintiff in person, via email, and over phone calls in addition to text messages.[123]

As such, the Court finds that Defendant remained in regular communication with Plaintiff and provided ongoing updates regarding the status of the Property construction from the execution of the Contracts through Plaintiff's termination of Defendant. Additionally, Defendant credibly testified that he was diagnosed with stage 4 cancer and that he underwent three rounds of chemotherapy treatment beginning in October 2022.[124] Nevertheless, Plaintiff, for purposes of impeachment, offered copies of photographs that Defendant posted on social media, which showed him engaging in activities such as attending a baseball game, sitting in a vehicle, wearing a new suit, and riding horses.[125] The Court finds that these social media photographs do not demonstrate that Defendant misrepresented his health status. No other evidence was presented to contradict

---

[119] ECF No. 25 at 152.

[120] Jan. 28, 2026 Trial (Plaintiff testifying); ECF No. 25-13.

[121] ECF No. 25-13 at 153.

[122] Jan. 28, 2026 Trial (Defendant testifying).

[123] Jan. 28, 2026 Trial (Defendant and Plaintiff testifying).

[124] Jan. 28, 2026 Trial (Defendant testifying).

[125] ECF No. 25-10; Jan. 28, 2026 Min. Entry.

Defendant's credible testimony that he was diagnosed with cancer and underwent chemotherapy. Thus, the Court finds that Plaintiff has not demonstrated that Defendant avoided his duties under the Contracts by misrepresenting his health status or ignoring Plaintiff's communications. Moreover, at trial, Plaintiff admitted that construction of the Property was at least partially completed, and photographs of Defendant sent to Plaintiff via text confirmed that portions of the Property, such as the driveway and part of the framing, were completed.[126]

Given Plaintiff's failure to show that Defendant intentionally or willfully caused delays in the commencement or completion of construction, or that Defendant evaded his contractual duties by misrepresenting his health status or disregarding Plaintiff's communications, and considering that construction was partially completed, the Court finds the circumstantial evidence insufficient to support an inference that Defendant, acting on behalf of CCMC, lacked an intent to complete the project. Accordingly, the Court finds that Plaintiff has not carried her burden to prove that, at the time Defendant entered into the contracts on CCMC's behalf, Defendant possessed the specific intent that CCMC would not complete construction of the Property

Plaintiff also asserts that she paid CCMC amounts exceeding $348,504.00 by $70,189.69 and that Defendant misrepresented to Plaintiff that the amounts she paid that exceeded $348,504.00 would be credited back to her.[127] At trial and at Plaintiff's request, the Court entered into evidence a table listing all payments she purportedly made directly to CCMC between October 21, 2021 and February 24, 2023, with descriptions and dates for each payment.[128] The table shows

---

[126] Jan. 28, 2026 Trial (Plaintiff testifying); ECF No. 25-13 at 74–86, 106–07.

[127] ECF No. 44 at 14; Jan. 28, 2026 Trial (Plaintiff testifying).

[128] ECF No. 25-2 at 35.

payments in connection with the Contracts that total $418,693.69.[129] Plaintiff credibly testified that she made each payment by wire or check at Defendant's direction.[130] Although no wire receipts or canceled checks were provided, Defendant acknowledged that Plaintiff paid CCMC more than the contract price, and no evidence contradicted Plaintiff's credible testimony that she paid a total of $418,693.69 to CCMC.[131] And although the text messages between Plaintiff and Defendant do not specify the exact amounts of money wired to CCMC, the text messages show Defendant confirming receipt of multiple wires sent to CCMC.[132]

As such, the Court finds that Plaintiff paid CCMC $418,693.69, exceeding the $348,504 contract price by $70,189.69. But, there is insufficient evidence to demonstrate that at the time Defendant, on behalf of CCMC, executed the Contracts with Plaintiff, Defendant did not intend to complete construction within the $348,504 contract price. Defendant explained that the reason why construction costs were more than he expected was because COVID-19 caused labor shortage and disrupted supply chains that made procuring construction material difficult and expensive.[133] Defendant testified that COVID-19 made it difficult to procure necessary construction materials, including lumber, doors, and windows.[134] Defendant further testified that he thoroughly explained these procurement difficulties to Plaintiff.[135] Plaintiff denies that Defendant ever informed her of the effects that COVID-19 had on the construction.[136] However, although the text messages

---

[129] ECF No. 25-2 at 35.

[130] Jan. 28, 2026 Trial (Plaintiff testifying).

[131] Jan. 28, 2026 Trial (Defendant testifying).

[132] *See e.g.*, ECF No. 25-13 at 68, 108.

[133] Jan. 28, 2026 Trial (Defendant testifying).

[134] Jan. 28, 2026 Trial (Defendant testifying).

[135] Jan. 28, 2026 Trial (Defendant testifying).

[136] Jan. 28, 2026 Trial (Plaintiff testifying).

between Defendant and Plaintiff do not expressly reference COVID-19, they reflect that Defendant and Plaintiff discussed increases in material costs, difficulties in obtaining materials, and delays in performance by the labor that Defendant hired. For example, on May 3, 2022, Plaintiff texted Defendant, "I have original lumber package was $36,523 and now it is $53,686.38 . . . is that what you have? And that will even out at the end?" That same day, Defendant responded, "ya it went up to 72k and just came back down."[137] Notably, the onset of COVID-19 occurred in March 2020, and the Contracts were executed in September 2021—approximately one and a half years later.[138] Nonetheless, there is no evidence that Defendant was aware, at the time he executed the Contracts on behalf of CCMC, of the specific effects COVID-19 would have on the Property construction. Indeed, Defendant testified that, between March 2020 and September 2021, when the Contracts were executed, he was not aware of any effects that COVID-19 had on his construction market.[139]

The Court therefore finds the record insufficient to show that, when Defendant executed the Contracts on CCMC's behalf, Defendant lacked a present intent to perform—i.e., that Defendant did not intend to complete construction of the Property for the $348,504 contract price—or that Defendant knew at that time the Property could not be constructed for that price.

Finally, Plaintiff asserts that when Defendant requested money that exceeded the agreed price of $348,504, Defendant represented that Plaintiff would be credited for the excess payments so that it would not change the total price Plaintiff had to pay for construction.[140] Plaintiff credibly testified that she did not receive any refund of her excess payments, and no evidence was presented

---

[137] ECF No. 25-13 at 30.

[138] ECF No. 25-2 at 12, 22.

[139] Jan. 28, 2026 Trial (Defendant testifying).

[140] Jan. 28, 2026 Trial (Plaintiff testifying); ECF No. 5 at 7.

to contradict this testimony.[141] Plaintiff also credibly testified that Defendant repeatedly represented that any amounts she paid in excess of $348,504 would be credited back to her, and that she would not be required to pay more than $348,504 for completion of the construction.[142] Text messages between Plaintiff and Defendant reflect that, on multiple occasions when Plaintiff expressed concern about costs exceeding expectations, Defendant either did not respond or reassured Plaintiff that any additional costs would not affect the final contract price for the construction.[143] For example, on December 11, 2022, Plaintiff texted Defendant that "the AC is nearly double what was on the draw. You said it wouldn't cost any more."[144] Then Defendant texted back that same day that "I'm not doing a change order on you so the final price of the house is the same."[145] Thus, the evidence demonstrates that when Defendant requested funds that exceeded $348,504, Defendant represented that any additional amounts would be credited back to her and that Plaintiff would not be required to pay more than $348,504 as the total price of construction.[146] Additionally, testimony from Plaintiff and Defendant confirm that no money was ever credited back to Plaintiff by CCMC or Defendant.[147]

However, there is no evidence that any of the funds Plaintiff paid to CCMC were used for purposes other than construction of the Property. Defendant credibly testified that all amounts received from Plaintiff were applied toward the construction of the Property and that he did not

---

[141] Jan. 28, 2026 Trial (Plaintiff testifying).

[142] Jan. 28, 2026 Trial (Plaintiff testifying).

[143] *See e.g.*, ECF No. 25- 13 at 13, 23, 30.

[144] ECF No. 25-13 at 102.

[145] ECF No. 25-13 at 102.

[146] *See also* ECF No. 25-13 at 26, 27.

[147] Jan. 28, 2026 Trial (Defendant and Plaintiff testifying).

realize a profit from the project.[148] Defendant's testimony is buttressed by evidence that partial construction of the Property was, in fact, completed.[149] Plaintiff testified that she received notices of unpaid invoices from subcontractors for work performed on the New Home construction but the evidence does not establish that any invoices remained unpaid by Defendant.[150] For example, Plaintiff received a letter from a company named "Kmax" indicating an outstanding invoice for driveway construction services performed on the Unimproved Lot.[151] Defendant explained that he ultimately paid Kmax in full, but initially delayed payment due to Plaintiff's complaint regarding a crack in the driveway.[152] Plaintiff also contends that certain materials and fixtures, including a rain chain, barn door hardware, and a cabinet that Plaintiff paid for and that were delivered to the Unimproved Lot, are missing.[153] However, Plaintiff admitted she has no personal knowledge of the whereabouts of these materials and fixtures.[154] There was no evidence otherwise presented to demonstrate that Defendant misappropriated or stole the missing materials and fixtures. Finally, Plaintiff admitted that she lacked personal knowledge of whether or not the funds received by CCMC from Plaintiff were used for anything other than the Property construction.[155]

As a result, the Court finds that Plaintiff has not carried her burden to show that Defendant misappropriated any funds or materials that Plaintiff paid or provided to CCMC. The record contains no competent evidence that Defendant never intended to refund any excess payments to

---

[148] Jan. 28, 2026 Trial (Defendant testifying).

[149] Jan. 28, 2026 Trial (Plaintiff testifying); ECF No. 25-13 at 74–86, 106–07.

[150] Jan. 28, 2026 Trial (Plaintiff testifying).

[151] Jan. 28, 2026 Trial (Plaintiff testifying).

[152] Jan. 28, 2026 Trial (Defendant testifying).

[153] Jan. 28, 2026 Trial (Plaintiff testifying).

[154] Jan. 28, 2026 Trial (Plaintiff testifying).

[155] Jan. 28, 2026 Trial (Plaintiff testifying).

Plaintiff. Accordingly, the Court finds that Plaintiff has failed to establish that, at the time Defendant—acting on behalf of CCMC—represented that payments exceeding the $348,504 contract price would be credited back to Plaintiff, Defendant possessed the requisite intent or knowledge that he would not honor that representation.

Accordingly, Plaintiff has not shown that, when Defendant executed the Contracts on CCMC's behalf, Defendant (1) lacked the intent to cause CCMC to complete construction of the Property, (2) lacked the intent to complete construction for the $348,504 contract price or knew the work could not be completed for that amount, or (3) promised that any payments exceeding $348,504 would be credited back to Plaintiff while lacking the intent to honor that promise or knowing it would not be honored. On this record, the Court finds that Plaintiff has not carried her burden to prove that Defendant falsely represented that CCMC would complete construction of the Property and that the total construction price would not exceed $348,504.00. For the same reasons, Plaintiff has not met her burden to establish that Defendant knowingly made material misrepresentations to Plaintiff, or made such representations with reckless disregard for their truth or falsity.

### d. Intent to induce action

"[T]he mere fact that it should be known that another will rely upon a misrepresentation does not, of itself, establish that the misrepresentation was made with the intent to induce reliance."[156] But, "a defendant who acts with knowledge that a result will follow is considered to intend the result."[157] In determining whether a defendant made a misrepresentation with intent to induce an action, Courts look to circumstantial evidence, such as a "pattern of malfeasance," a

---

[156] *Willis v. Marshall*, 401 S.W.3d 689, 702 (Tex. App. 2013).

[157] *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins*. Co., 51 S.W.3d 573, 579 (Tex. 2001).

failure to perform a promise, and the credibility of the witnesses and the weight of their testimony.[158]

As established *supra*, Plaintiff failed to demonstrate that Defendant made any material misrepresentations to Plaintiff.[159] Therefore, the Court finds that Plaintiff cannot meet her burden of demonstrating that Defendant made  any misrepresentations intending to induce any action by Plaintiff.

### e.  Injury as a direct result from misrepresentation

In regards to the injury element of a fraud claim, there generally "must be pleading and proof of a pecuniary loss suffered which is directly traceable to, and which resulted from, the false representation upon which the injured party relied."[160] The measure of damages is the actual amount of a plaintiff's loss that directly and proximately resulted from the fraud.[161] Damages under a fraud claim must be proven with reasonable certainty and not based on speculation.[162]

Because the Court has found that Plaintiff failed to show Defendant made any material misrepresentation, and further failed to carry her burden of proving any misrepresentation was made with the intent to induce Plaintiff to act, the Court need not reach the remaining elements of fraud—namely, whether Plaintiff suffered injury as a result of the alleged misrepresentation and

---

[158] *Arete Partners LP v. Gunnerman*, 594 F.3d 390, 398 (5th Cir. 2010); *Ctr. Operating Co., L.P. v. Base Holdings*, *LLC* (*In re Base Holdings, LLC*), 487 B.R. 727, 746 (Bankr. N.D. Tex. 2012); *Harding Co. v. Sendero Res., Inc.*, 365 S.W.3d 732, 748 (Tex. App. 2012)

[159] *See supra* Section IV.C.2.b.

[160] *McCurry v. Aetna Cas. & Sur. Co.*, 742 S.W.2d 863, 867 (Tex. App. 1987).

[161] *Coffel v. Stryker Corp.*, 284 F.3d 625, 637 (5th Cir. 2002) (applying Texas law).

[162] *See id.*

whether any damages flowed from it. [163]   Accordingly, because Plaintiff has not demonstrated that Defendant knowingly made a material misrepresentation with the intent to induce Plaintiff's action, Plaintiff's fraud claim against Defendant fails. Because each of Plaintiff's underlying causes of action against Defendant fails, Plaintiff has not established that Defendant owes Plaintiff any underlying debt

**D.    Determination of the dischargeability of debt pursuant to §§ 523(a)(2)(A); (a)(4); and (a)(6)**

Here, Plaintiff has not carried her burden to establish that Defendant owes Plaintiff an underlying debt. Because the existence of a debt is a threshold requirement to any determination of nondischargeability, the Court need not reach whether any alleged obligation would be excepted from discharge under the asserted nondischargeability theories. [164]   Accordingly, the Court finds that Plaintiff failed to prove the existence of a debt owed to her by Defendant and, on that basis, denies Plaintiff's nondischargeability claims for lack of an underlying debt. [165]

**E.    Determination of the dischargeability of debt pursuant § 727(a)(4)**

Plaintiff asserts a claim for denial of discharge based on Defendant's alleged false oath or account in connection with the bankruptcy case, applying the governing standards in the Fifth

---

[163] *See Paull v. Capital Res. Mgmt., Inc.*, 987 S.W.2d 214, 221 (Tex. App. 1999). (holding that a "factual misrepresentation is an essential element" of common law fraud); *Digby v. Tex. Bank*, 943 S.W.2d 914, 919 (Tex. App. 1997) (holding that a court may enter judgment in favor of a defendant if "a defendant can disprove any one of the essential elements of the plaintiff's cause of action").

[164] *Parker v. Miller* (*In re Miller*), 589 B.R. 550, 560-61 (Bankr. S.D. Miss. 2018) ("[A] bankruptcy court cannot declare a debt nondischargeable until the creditor establishes the existence and amount of that debt."); *Countrywide Home Loans, Inc. v. Cowin* (*In re Cowin*), 492 B.R. 858, 891 (Bankr. S.D. Tex. 2013) ("The Plaintiffs must first establish that the Debtor owes them debts before they can challenge the dischargeability of those debts.").

[165] *See Husky Int'l Elec., Inc. v. Ritz* (*In re Ritz*), 832 F.3d 560, 562 (5th Cir. 2016) (noting on remand from the U.S. Supreme Court that if "there is no debt to discharge[,] the question of the deniability of a discharge under § 523(a)(2) is moot").

Circuit.[166] In the Complaint, Plaintiff specifically relies on 727(a)(4)(A) and (B), asserting that discharge should be denied because (1) "Debtor presented and used false claims" and (2) "Debtor incurred his state court judgment debt because of his presentation and use of false claims with Ms. Groves throughout the course of the construction of her home."[167]

Pursuant to § 727(a)(4), a debtor is denied a discharge if:

> **(4)**the debtor knowingly and fraudulently, in or in connection with the case—
>
> **(A)** made a false oath or account;
>
> **(B)** presented or used a false claim;
>
> **(C)** gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or
>
> **(D)** withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs.

Under § 727(a)(4)(A), "[t]he objecting party has the burden of proving that (1) the debtor made a false statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement was material to the bankruptcy case"[168] As to § 727(a)(4)(B), "the evidence must show that the debtor 'presented or used' inflated or fictitious claims in his or her bankruptcy case with the intent to defraud."[169] Objections to discharge under § 727(a)(4)(B) typically arise where a debtor lists fictitious liabilities, overstates the amount of actual debts, or submits a false proof of claim.[170]

---

[166] 11 U.S.C. § 727(a)(4).

[167] ECF No. 5 at 12.

[168] *Sholdra v. Chilmark Fin. LLP (In re Sholdra)*, 249 F.3d 380, 382 (5th Cir. 2001).

[169] *Parker v. Miller* (*In re Miller*), 589 B.R. 550, 566 (Bankr. S.D. Miss. 2018).

[170] *See Scheidelman v. Henderson (In re Henderson)*, 423 B.R. 598, 619 (Bankr. N.D.N.Y. 2010) (noting that objections to discharge under § 727(a)(4)(B) generally involve the scheduling of non-existent debts, the scheduling of inflated debts, or the filing by the debtor of a false proof of claim).

A denial of discharge pursuant to § 727(a)(4) is distinct from a discharge denial under § 523(a) because § 523(a) addresses the non-dischargeability of specific debts while still allowing the debtor to receive a general discharge for other debts.[171] In contrast, a successful claim under § 727(a)(4) results in the denial of a complete discharge, not merely the discharge of a particular debt.[172] "[A] party who has not yet proved its claim has the right to oppose discharge"[173] Thus, a creditor generally has standing to bring a claim under § 523(a) to establish an underlying debt and to have that debt deemed non-dischargeable. But, "a party whose claim has been conclusively disproved cannot object to a debtor's discharge."[174]

Here, in evaluating Plaintiff's claim that the debt is nondischargeable, the Court concluded that Plaintiff did not carry her burden to prove that Defendant owed Plaintiff an enforceable underlying debt.[175] Because Plaintiff failed to establish an underlying debt that could be affected by the bankruptcy discharge, the Court further determined that Plaintiff lacked standing to pursue an objection to discharge based on an alleged false oath.[176] Accordingly, Plaintiff's request for a general denial of discharge fails for lack of standing.[177]

---

[171] 11 U.S.C. § 523(a).

[172] 11 U.S.C. § 727(a).

[173] *In re Vahlsing*, 829 F.2d 565, 567 (5th Cir. 1987).

[174] *Id*.

[175] *See supra* Section IV.C.2.e.

[176] *Id*. ("A discharge would affect the interests of creditors with disputed claims since they have a chance of prevailing on their claims. When, as in our case, however, a would-be creditor's only claim has been finally dismissed, a discharge will not even potentially affect her interests. Thus, [the plaintiff] is not a creditor. She has no standing under the Bankruptcy Code to continue to pursue her adversary proceeding opposing [the defendant's] discharge.").

[177] *See id. See also Doyle v. Howie-Cox (In re Howie-Cox)*, 515 B.R. 533, 549 (Bankr. E.D. Mich. 2014) ("In her amended complaint, [the plaintiff] also seeks a denial of [the debtor's] discharge, based on 11 U.S.C. §§ 727(a)(4)(A) and 727(a)(5). Because there is no debt owing to [the plaintiff] from [the debtor], however, [the plaintiff] is not

Because Plaintiff failed to meet her burden of proof on any of her non-dischargeability claims under §§ 523(a)(2)(A); (a)(4); and (a)(6) and lacks standing to prevail on her claim for a general denial of discharge under § 727(a)(4), Plaintiff cannot prevail on her non-dischargeability claims under §§ 523(a)(2)(A); (a)(4); and (a)(6), or on her claim for a general denial of discharge under § 727(a)(4).[178] Thus, Plaintiff's motion for judgment based on partial findings pursuant to Rule 52(c), as made applicable pursuant to Bankruptcy Rule 7052, is denied as to Plaintiff's non-dischargeability claims under §§ 523(a)(2)(A); (a)(4); and (a)(6) and as to Plaintiff's claim for a general denial of discharge under § 727(a)(4).

For the reasons stated herein, the Court finds that Kelly Groves failed to meet her burden of proving the existence of a debt owed to her by Jeffery Paul Crowder and therefore, her non-dischargeability claims under 11 U.S.C. §§ 523(a)(2)(A); (a)(4); and (a)(6) are denied because Plaintiff failed to establish any underlying debt and her claim for a general denial of discharge under 11 U.S.C. § 727(a)(4) is also denied for a lack of standing.

### V.   CONCLUSION

A judgment consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

**SIGNED Thursday, May 7, 2026**

_____
**Eduardo V. Rodriguez**
**Chief United States Bankruptcy Judge**

---

a creditor in [the debtor's] bankruptcy case. Because of this, [the plaintiff] does not have standing to object to [the debtor's] discharge.") (citing cases, including *In re Vahlsing*, 829 F.2d at 567).

[178] ECF No. 5.